Filed 5/4/15  P. v. Partida CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B253091 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA387117) |
| v. | |
| JOSE FRANCISCO PARTIDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Ronald H. Rose, Judge.  Affirmed with directions.

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jose Francisco Partida (defendant) appeals from his convictions of murder, attempted murder, attempted robbery, and possession of a gun by felon. He contends that the convictions must be reversed because the trial court erred in giving two jury instructions (CALCRIM Nos. 1863 and 1403) without first modifying them, and because his murder and attempted murder convictions were unsupported by substantial evidence of premeditation and deliberation. Defendant also contends that the trial court abused its discretion in refusing to unseal juror information, and erred in imposing a consecutive sentence as to one of the attempted robbery counts rather than staying the term imposed. Finally, defendant points to an error in the abstract of judgment, which both defendant and respondent ask to be corrected to accurately reflect the oral pronouncement of judgment. We order the trial court to issue a corrected abstract of judgment. However, finding no merit to defendant's remaining contentions, we affirm the judgment.

## BACKGROUND

An amended information charged defendant with the following crimes: count 1, the murder of Plutarco Salguero Soriano (Soriano), in violation of Penal Code, section 187, subdivision (a);[1] count 2, the attempted willful, deliberate, and premeditated murder of Carlos Delgado (Delgado) (§§ 664, 187, subd. (a)); count 3, possession of a firearm by a felon (§ 12021, subd. (a)(1)); and counts 4 and 5, attempted first degree residential robbery (§§ 664, 211). As to all five counts, the amended information alleged that defendant had suffered three prior convictions for which he served prison terms within the meaning of section 667.5, subdivision (b). As to counts 1, 2, 4, and 5, the information alleged that defendant personally and intentionally used and discharged a firearm, causing great bodily injury and death to the victims within the meaning of section 12022.53, subdivisions (b) through (d). In addition the amended information alleged that the murder was committed by defendant while he was engaged in the commission of the crimes of robbery and burglary, within the meaning of section 190.2, subdivision (a)(17).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

A jury found defendant guilty of all counts as charged and found true all special allegations. On December 2, 2013, the trial court sentenced defendant to life in prison without the possibility of parole as to count 1, enhanced by a consecutive term of 25 years to life under section 12022.53, subdivision (d), plus consecutive but stayed enhancements under subdivisions (b) and (c) of that section, of 10 and 20 years respectively. As to count 2, defendant was sentenced to a life term, plus a consecutive term of 25 years to life pursuant to section 12022.53, subdivision (d), as well as consecutive but stayed enhancements under subdivisions (b) and (c) of that section, of 10 and 20 years respectively. The court imposed the high term of three years as to count 3,[2] and the high term of six years as to court 4, plus firearm enhancements, all stayed under section 654. As to count 5, the court sentenced defendant to a consecutive high term of six years, plus firearm enhancements, and stayed only the firearm enhancements under section 654. Defendant's total unstayed sentence was life without parole plus 56 years to life. Defendant received presentence custody credit of 861 actual days, and was ordered to pay mandatory fines and fees. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Delgado lived in East Los Angeles with Ana Lilian Zepeda (Zepeda) and Soriano, Zepeda's brother. On January 30, 2011, he was home watching television and drinking beer when Soriano came home and went into his bedroom with two women Delgado had never seen before. Zepeda had already gone to bed.

Magaly Gonzalez (Gonzalez) was one of the two women. She testified that she was acquainted with defendant and knew him by his nicknames Boomer and Downer. Gonzalez was also acquainted with the other woman, Damarius Teresa Rosales (Rosales), whose nickname was "Lil' Girl." Sometime after midnight Gonzalez was walking with Rosales when Soriano, who was unknown to them, approached and asked whether they

---

[2]    For purposes of count 3, felon in possession of a firearm, defendant stipulated that he had suffered the alleged prior convictions, and the prosecution dismissed the three prison prior allegations.

3

wanted to have a good time with him. They agreed and both women got into his car, went with him to buy beer, and then went to his house. After awhile they left the house to buy marijuana and then returned to Soriano's bedroom.

When Soriano bought the marijuana the women noticed he had a lot of money. Rosales communicated to Gonzalez by text message to the effect that she had a plan to rob Soriano, had taken his car keys, and that she had arranged for her friend "Boomer" to pick her up. When defendant arrived in a van with another person, Gonzalez and Rosales were about to leave with him when Gonzalez realized that she had forgotten her marijuana. She went back for it and Soriano came out and gave it to her. Gonzalez then got back into the van and was taken home. Later, after Rosales sent a text message to Gonzalez, "We messed up," Gonzalez called Soriano several times throughout the morning to check whether he was alive. Gonzalez testified that defendant was a member of the Clarence Street gang and that she was afraid that "they" were going to come looking for her, possibly to kill her, because she was "ratting someone out" in her testimony.

Gonzalez denied knowing the other man in the van with defendant. He was Jesus Rolon (Rolon), who testified that he was at the home of his friend "Junior" that night with defendant and others when defendant asked Junior to give him a ride in his van to pick up two girls. Junior had been drinking, so he asked Rolon to drive defendant in his van. Rolon testified that when they stopped for gas along the way, defendant took the keys from him and drove the van himself. Rolon did not resist because defendant was aggressive and intimidating; he had gang tattoos and Rolon believed that defendant was a member of the Clarence Street gang.

After dropping Gonzalez off at her home, Rolon testified that defendant drove around and then went back to the house where they had picked up the two women. Rolon was in the back of the van and although he could not hear much of the conversation between defendant and Rosales, who were in the front, he did hear the words, "wallet," "in the drawer," and "money." Rolon saw Rosales get out of the van, walk toward the gate and out of sight, and then return to the van, where she gestured "desperately," while

4

saying something that Rolon could not hear. Defendant then got out of the van and walked toward the gate. Rolon did not see defendant go into the house but soon he heard three or four noises like firecrackers. Rosales, who remained just outside the open passenger door of the van until defendant returned, said, "Oh my god. Hurry. Hurry." As defendant drove away, Rosales said, "Oh, my god. What did you do?" It was noisy in the back of the van where Rolon still sat, and he did not hear a response. Rolon denied seeing a gun in defendant's hand. Rolon testified that he was concerned about his safety and his family's safety, and was afraid that gangs or defendant's friends would come after him.

Delgado testified that he sat in his pajamas watching television in the living room while the two women were in the bedroom with Soriano, as well as when they went out and came back. He did not know what they were doing in the bedroom. Delgado was still watching television when the women left for the last time. A short time later, Delgado saw Soriano sitting by himself in the driveway.

The next time Delgado saw Soriano, the latter was coming into the house with a man Delgado had never before seen. The man, later identified as defendant, appeared to be holding his right arm around Soriano's waist, while walking against the wall sideways in a "weird" way. When they stopped in front of Delgado, Delgado saw that defendant was holding a gun. Defendant stepped around Soriano, moved the gun back and forth, pointing it at Soriano and then at Delgado, and said, "Give me the money." Soriano asked Delgado to give him the money, which confused him, because Soriano had not given Delgado any money. As Delgado got up to get money from his pants, Soriano lifted a small stool and swung it toward defendant's face. Delgado then heard about four gunshots and saw muzzle flash. Soriano fell but defendant continued to stand with the gun in his hand, so Delgado ran across the living room to defendant, where they struggled over the gun. Unable to dislodge the gun from defendant, Delgado pushed him and was then shot in the face. Even after defendant shot him, Delgado tried to take the gun away, but tripped over Soriano's body and fell. As Delgado lay on the floor defendant fired again and Delgado felt a bullet strike him in the neck. As Delgado tried to get up he saw

5

defendant jump over Soriano's body and run outside.  Zepeda came out of the bedroom to find Delgado bleeding.

Delgado was taken to the hospital where he was treated for two bullet wounds, one on the right side of his face and one in the neck.  The bullet that entered his face traveled through the sinus cavity and came to rest at the base of the left side of his skull.  The bullet that entered his neck injured the carotid artery and lodged in the soft tissue in front of the breastbone.  The bullets were not removed.

Soriano died of multiple gunshot wounds.  Deputy Medical Examiner Ajay Panchal testified that Soriano had been struck with four bullets in an undetermined order, three of which would have caused his death.  One bullet entered Soriano's left eye injuring multiple lobes of the brain, causing rapid or instant unconsciousness; one entered his left torso and perforated the left lower lung; another fractured his left arm; and a fourth bullet entered Soriano's left torso and passed through the heart and right lung.

Dr. Panchal explained soot and stippling.  Soot, or burned particles of gunpowder, could be deposited in a wound caused by a handgun fired in close range, not more than six inches away.  Stippling consisted of unburned particles of gunpowder that could strike the skin and cause pinpoint abrasions when a gun is fired from within a half an inch up to two feet from the target, unless blocked by something such as thick clothing.  Dr. Panchal concluded that as Soriano was not wearing thick clothing, but simply a white shirt, and there was no soot or stippling found on the body or clothing, the gun that killed Soriano was at least two feet away from him when fired.

Zepeda testified about waking up to gunfire and finding Delgado and her brother on the floor.  She briefly saw a man running away outside but could not identify him.  When she tried to go outside Delgado, who had regained consciousness, stopped her.

FBI Special Agent Chad Fitzgerald, an expert in analyzing cell phone connections and signals, analyzed records of the relevant cell tower and call evidence relating to the cell phones used by Soriano, Rosales, Gonzalez, and defendant on January 30, 2011.  He generally confirmed the movements of these individuals as described by other prosecution witnesses.

6

Michael Bosillo (Bosillo), custodian of records for Metro P.C.S., testified regarding the cell phones registered to Henessy Martinez and Michael Partillo, later identified by Sheriff's Sergeant Domenick Recchia as Rosales and defendant. Bosillo explained that because Metro P.C.S. was a prepaid cell phone company which did not offer service on credit, accounts could be opened under false names. Metro P.C.S. call records revealed that on January 30, 2011, between 1:40 a.m. and 1:46 a.m., the following text messages were sent from the cell phone later identified as belonging to Rosales, to the cell phone later identified as used by defendant: "Dick, never mind. Call now. Please, please, foo [phonetic]. I'm not playing. Serio [phonetic]"; and, "Okay. Call in ten. I'm gonna jack this fool. '*Ranfla y feria,*' I got the keys." The texts were signed, "Lil' Girl." Although the text messages were sent and received, there was no way to know whether defendant saw or read them.

**Defense evidence**

Defendant testified that Rosales was a friend who he referred to as "Lil' Girl"; but Gonzalez was a mere acquaintance whom he disliked. On the night of the shooting he had attended a friend's birthday party, had been drinking and was slightly intoxicated. He denied using drugs or marijuana. He received a text message from Rosales suggesting that he meet a friend of hers, but that did not work out. About three hours later Rosales sent another text message saying in effect that she needed help. Thinking she was in danger, he showed the message to his friends and asked for a ride. Defendant's friend, Junior suggested that Rolon drive defendant in Junior's van, since Junior had been drinking and defendant had no driver's license.

Defendant claimed he had just met Rolon and did not know his name and that he drove the van after stopping for gas because he knew the area better than Rolon. Defendant drove to the area Rosales directed and saw her talking to Soriano, who acted "kind of weird" as soon as he saw the van. Defendant became angry when he saw Gonzalez was with Rosales, and Gonzalez did not want to get into the van because she knew defendant did not like her. Gonzalez intended to walk home instead, but defendant insisted on driving her. In the van, Rosales told defendant that Gonzalez had forgotten

7

something at the house, so he drove her back. Gonzales retrieved what she had left, and returned about two minutes later. Defendant then drove Gonzalez home. Rosales then suggested they go back and "come up on this fool." Defendant understood this to mean "take his stuff." He repeatedly told her he did not want to go back and continued to drive in the direction of Rosales's house, intending to drop her off there, but then she said she had forgotten her "stuff" and insisted that they go back.

Defendant drove Rosales back to Soriano's house. Since there was no parking in the area Rosales got out of the van while defendant drove around and finally parked illegally. Defendant became inpatient waiting for Rosales so he decided to walk to the house to see what she was doing. On the way defendant saw Rosales sitting in the driver's seat of a truck with Soriano on the passenger side. They appeared to be arguing. Soriano looked in defendant's direction with surprise. Defendant told Rosales, "Let's get out of here," and she replied that Soriano would not return her stuff. Defendant became agitated and told Soriano in an unpleasant tone in Spanish to give him Rosales's stuff. Defendant admitted that he was carrying a loaded revolver, but denied displaying the gun. Soriano said the stuff was inside, so they went through the yard and into the house, which was dark except for light from the television.

Rosales waited in the van while defendant went into the house with Soriano, although defendant did not know what it was that Soriano refused to give back to Rosales. Defendant denied walking abnormally or having his arm around Soriano, and claimed that Soriano was in the lead. Soriano stopped in front of Delgado, who was watching television, and told him to give defendant the money. Defendant claims that he still had not drawn his gun and that he had not asked for money. Suddenly, something came flying toward his face, and he was struck in the head a couple times and then pushed. Defendant claimed he then pulled out his gun and started shooting because he feared for his life. He did not know how many times he fired or whether he hit someone. He did not see anyone on the floor, and because he thought they had run away, he did not look down for them, but instead ran outside to the van and drove away. Defendant denied jumping over the men.

8

Defendant claimed he never intended to steal from or rob anyone, and that after fleeing he became nauseated and threw up. Defendant did not call 911, did not need treatment for the lumps caused by the blows to his head, and did not tell anyone about incident. He fled because he feared prosecution.

Defendant acknowledged that he was known by two nicknames, Downer and Boomer, and that he was a member of the Clarence Street gang. He was given the name Downer from his "friends or whoever, people who jumped me in." Defendant claimed he used a false name to purchase a cell phone because he could not pay the fees charged for unpaid phone bills. Defendant admitted that although he was previously convicted of felon in possession of a firearm, he always carried a loaded gun. On the night of the shooting he carried a .22-caliber revolver which he had loaded himself with six bullets, all of which were fired that night. Defendant bought the gun illegally on the street.

Defendant denied that he read the text message from Rosales that said, "Okay. Call in ten. I'm gonna jack this fool. '*Ranfla y feria*,' I got the keys"; however, he admitted that he called Rosales about a minute or two later. Defendant explained that *ranfla* was Spanish for car, that *feria* was Spanish for money, and that to "jack" someone meant to rob the person. Defendant claimed that Rosales did not mention a wallet or money and they had no such conversation in the van as described by Rolon. He denied ever demanding money. Defendant saw the video recording of Gonzalez's police interview in which she told investigators about a plan to rob Soriano and gave a description of a conversation in the van in which she asked to be taken home because she wanted nothing to do with the plan, and told the others not to do anything crazy.[3] Defendant testified that it "didn't happen."

---

**3** Neither the video nor a transcript of the interview has been made part of the record on appeal.

9

## I.  CALCRIM No. 1863:  claim of right instruction

Defendant contends that although the trial court gave a requested claim of right instruction, the court erred in failing to modify it to fit his theory of defense.  At defendant's request, the trial court read CALCRIM No. 1863 to the jury.  The portion of the instruction relevant to this issue was the following:  "If the defendant obtained property under a claim of right, he did not have the intent required for the crime required of robbery.  The defendant obtained property under a claim of right if he believed in good faith that he had a right to the specific property or specific amount of money and he openly took it."[4]  Defendant does not contend that the instruction is an incorrect statement of law, but argues that because it was inapplicable to his particular theory of defense the trial court should have added language to the effect that a defendant's good faith belief in the right to property can be based upon a good faith belief that he was helping to reclaim another person's property.

Defendant was charged with killing Soriano in the course of a robbery.  "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)  "A good faith claim of right to title or ownership of specific property taken from another can negate the element of felonious taking (a taking accomplished with intent to steal) necessary to establish theft (§ 484) or robbery (§ 211)."  (*People v. Tufunga* (1999) 21 Cal.4th 935, 945 (*Tufunga*), boldface and italics omitted.)

---

[4]     The remainder of CALCRIM No. 1863 was read as follows:  "In deciding whether the defendant believed that he had a right to the property and whether he held that belief in good faith, you should consider all of the facts known to him at the time he obtained the property along with all the other evidence in the case.  The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable.  But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith.  The claim of right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal.  If you have a reasonable doubt about whether the defendant had the intent required for robbery, you must find him not guilty of robbery."

As defendant points out, a claim of right instruction must be given when substantial evidence supports "a good faith belief by a defendant, tried as an accomplice, that he was assisting his coprincipal retake the principal's property . . . ." (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1528-1529 (*Williams*).)  Because there was such substantial evidence in *Williams*, "the trial court erred in refusing to give a modified version of CALCRIM No. 1863." (*Id*. at p. 1529, fn. omitted.)

Respondent contends both that the issue has been forfeited due to defendant's failure to object to the wording of CALCRIM No. 1863, and that no modification was necessary.  We agree that no modification was necessary, as CALCRIM No. 1863 does not preclude a claim of right based upon a request from the rightful owner.  However, we conclude that the trial court was not required to give the instruction, modified or unmodified, as defendant failed to demonstrate that the request was supported by substantial evidence.  We evaluate the evidence supporting a claim of right instruction under the defendant's account of events, and any doubts as to the sufficiency of the evidence to support the instruction should be resolved in defendant's favor.  (*Tufunga, supra*, 21 Cal.4th at p. 944.)  However, "a trial court has no obligation to instruct sua sponte on a defense supported by 'minimal and insubstantial' evidence [citation] . . . ." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1152 (*Barnett*).)

Defendant contends that the evidence was sufficient because he testified in his defense that he went into the house only to retrieve property belonging to Rosales.  The good faith belief in a claim of right must relate to *specific* property.  (*Tufunga, supra*, 21 Cal.4th at p. 945.)  And that belief must be a subjective one.  (*Barnett, supra*, 17 Cal.4th at p. 1152.)  Thus, a claim of right defense requires identification of the property, as well as evidence of how it relates to the defendant's claim of right.  (See *People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1022.)  Here, defendant testified that he did not know what "stuff" Soriano had reportedly refused to give to Rosales, and there was no evidence of any circumstances that would suggest that she had any right to any particular property.  Moreover, defendant did not testify that he subjectively thought that Rosales had a right to any property.  Indeed, defendant admitted that before Rosales told defendant that she

11

had forgotten her stuff, she expressed a desire to "come up on this fool," which defendant understood to mean "take his stuff." Rosales apparently repeatedly expressed her desire to take Soriano's property, as defendant testified he kept saying that he did not want to go back and relented only after she claimed that she had forgotten her stuff.

In short, defendant had no idea what property belonged to Rosales and had no reason to believe that she had a right to whatever the property might have been. We conclude that the evidence of defendant's claim of right defense was "minimal and insubstantial"; thus, no claim of right instruction was required. (*Barnett, supra*, 17 Cal.4th at p. 1152.) As no instruction was required, the trial court did not err in failing to modify the instruction given.

## II. CALCRIM No. 1403: limited purpose of gang activity

Defendant contends that the trial court erred in reading CALCRIM No. 1403 to the jury without modification.

The trial court instructed: "You may consider evidence of gang activity only when you evaluate the credibility or the believability of a witness. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit a crime."

Defendant did not object to the admission of the evidence of his gang membership but objected to the instruction because it allowed the jury to consider the gang affiliation evidence in evaluating his credibility or believability. Defendant does not contend that the instruction was incorrect in allowing the jury to use such evidence to evaluate other witnesses' testimony, and he acknowledges that gang evidence may be relevant to establish a witness's bias or credibility. (See *People v. Ayala* (2000) 23 Cal.4th 225, 276.) Defendant also acknowledges that CALCRIM No. 1403 is properly given when gang evidence is admitted to provide a plausible explanation for a witness's reluctance to testify. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1169.) Defendant points out that although this rationale might apply to Rolon and Gonzalez, it did not apply to his own testimony. Neither defendant nor respondent has provided authority that would permit, prohibit, or limit the use of CALCRIM No. 1403 where the defendant

testifies.  Nevertheless, defendant contends that because evidence of gang affiliation can be inflammatory, the instruction should have been modified to make clear that the instruction did not apply to defendant.

Respondent relies on the general rule that "'[b]y taking the stand, defendant put his own credibility in issue and was subject to impeachment in the same manner as any other witness.' [Citations.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 438.)  Defendant's argument, however, is that the evidence did not impeach him in the same manner as the other witnesses, as he was not reluctant to testify and expressed no fear of gangs. Respondent counters that it was not likely that that jury would improperly use any gang evidence in evaluating his credibility, because the instruction made clear that the jury was not to conclude from the gang evidence that the defendant had a bad character or disposition to commit a crime.  We agree as this was the only part of the instruction which referred specifically to defendant; otherwise it referred to witness credibility in general.  We also note that the prosecutor did not mention defendant's gang membership anywhere in her final arguments.  Instead she pointed to the ways in which defendant's testimony conflicted with other testimony, in particular Rosales's text messages about robbing Soriano, the bits of conversation about a wallet and money which Rolon overheard in the van, and defendant's inability to identify any property which he supposedly went into the house to retrieve, as well as the manner in which he shot the victims.

Regardless, assuming the trial court was required to limit the consideration of defendant's gang membership to evaluating the credibility of witnesses other than defendant, any error in failing to do so was harmless.  Defendant did not deny that he shot Soriano and Delgado.  The primary credibility issue presented by defendant's testimony was his claim that he did not go into the house for a felonious purpose, but to retrieve Rosales's property, and once there he was attacked and defended himself.  As we have previously determined above, his testimony was insufficient to support his claim of right defense because he failed to identify specific property, any facts demonstrating his or Rosales's right to the property, or his ignorance of facts that would make that belief

13

unreasonable.  (See *Tufunga, supra*, 21 Cal.4th at p. 945; *Barnett, supra*, 17 Cal.4th at p. 1152; *People v. Alvarado, supra*, 133 Cal.App.3d at p. 1022.)  Thus, even if defendant's testimony had been believed, it would not have provided a defense.

Moreover, it is not reasonably likely that the jury would have found defendant's testimony credible even if the instruction had been limited as defendant suggests.  The evidence demonstrating defendant's intent to rob Soriano was overwhelming.  It was clearly Rosales's intent to rob Soriano, as she expressed that intent in a text message to Gonzalez.  Rosales also sent defendant a message about her intent before he picked her up, writing, "I'm gonna jack this fool.  '*Ranfla y feria*,' I got the keys."  Defendant knew that "jack" meant to rob, and although he denied ever reading this text message, he admitted having called Rosales a minute or two later.  Once defendant picked up Rosales, he certainly knew of her intent, as he admitted that Rosales suggested they go back and "come up on this fool," which he understood to mean "take his stuff."  Rolon overheard parts of a conversation between defendant and Rosales, including the words, "wallet," "in the drawer," and "money."  Belying defendant's claim that he merely intended to retrieve Rosales's property, defendant did not ask Rosales to identify the "stuff" that Soriano refused to give back to her; and then, armed with a fully loaded firearm, defendant went into the house with Soriano while Rosales remained in the van and thus unavailable to identify the property.  The only reasonable inference to be drawn from such evidence was that defendant had no intention of retrieving property belonging to Rosales, but intended to carry out Rosales's plan of robbing Soriano.

We conclude that there is no reasonable probability that defendant would have obtained a more favorable result had the trial court instructed the jury to consider defendant's gang membership solely to evaluate the credibility of witnesses other than defendant.  The omission of that language was thus harmless under the test of *People v. Watson* (1956) 46 Cal.2d 818, 836.  We also conclude beyond a reasonable doubt that the omission of such language did not contribute to the verdicts, and thus find it harmless under the test of *Chapman v. California* (1967) 386 U.S. 18, 24.

14

### III. Substantial evidence of premeditation

Defendant contends that there was insufficient evidence of premeditation to support his convictions of first degree murder and willful, deliberate, and premeditated attempted murder. He asks that we reduce his first degree murder conviction to second degree murder and that we strike the jury's finding that the attempted murder was deliberate and premeditated.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt . . . .'" (*People v. Johnson, supra*, at p. 576.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence [citation], and to special circumstance allegations [citation]." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"All murder which is perpetrated by means of . . . willful, deliberate, and premeditated killing . . . is murder of the first degree." (§ 189.) Murder committed in the perpetration of attempted robbery is also first degree murder under the felony-murder rule. (*People v. Elliot* (2005) 37 Cal.4th 453, 469.) Defendant acknowledges that the jury found true the special circumstance of attempted robbery, but contends that the felony-murder theory fails due to the asserted instructional error regarding CALCRIM

15

No. 1863. As defendant does not contend that the attempted robbery finding is unsupported by substantial evidence, and we have rejected his claim of instructional error, we must affirm defendant's first degree murder conviction based upon the felony-murder rule.

Further, defendant has not demonstrated that the evidence which supports a finding that the murder or the attempted murder was premeditated, was insufficient. Defendant cites *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*) in which the California Supreme Court formulated guidelines based upon evidence of three factors, planning, motive, and manner of killing, "to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).) The *Anderson* guidelines are merely descriptive and did not purport to define or rewrite the elements of first degree murder, alter the substantive law of murder in any way, or change the traditional standards of appellate review. (*Perez*, at p. 1125.)

Using such guidelines, defendant contends there is no evidence that defendant planned to kill either victim, that he had a motive to kill, or that he killed in a manner suggesting anything but "a spur of the moment in response to a robbery gone bad." Defendant rejects the planning factor, claiming the only plan shown by the evidence was the plan to go into the house to rob Soriano. Defendant rejects the motive factor, because the prosecutor did not suggest a motive in argument, other than a motive to rob the victims. Finally, defendant minimizes the significance of the manner in which the victims were shot, because "[t]he fact that a slaying was unusually brutal, or involved multiple wounds, cannot *alone* support a determination of premeditation." (*People v. Alcala* (1984) 36 Cal.3d 604, 626-627, italics added.)

Initially, we observe that despite acknowledging the traditional standards of review, defendant's analysis depends entirely upon a review of the evidence in the light most favorable his own arguments, drawing inferences that would defeat the judgment, and referring mostly to his own testimony, despite any conflicts with other evidence. For

16

example, defendant cites his own testimony that Soriano *twice* struck defendant with a wrought iron stool and that defendant shot him *in response* to the attack. Delgado however testified that Soriano *swung* the stool toward defendant's face, but he did not say that he saw the stool strike defendant. Delgado also testified that defendant remained standing, fired his weapon four times, and remained standing after Soriano fell. Further, the medical examiner opined that defendant was at least two feet away from Soriano when he fired all four bullets into him. Thus, contrary to defendant's view of the evidence, the jury could reasonably infer that Soriano did not come closer to defendant than two feet and that he did not succeed in hitting defendant at all.

Defendant complains that "[r]espondent has failed to bear its burden of establishing premeditation and deliberation beyond a reasonable doubt." However, as the judgment is presumed correct, it is the appellant's burden to demonstrate that the evidence was insufficient to support the verdict. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) Defendant does not meet that burden "by citing only his own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself. . . . '[A] recitation of only [the appellant's] own evidence or a general unsupported denial that any evidence sustains the findings is not the "demonstration" contemplated under the rule.' [Citation.]" (*Id*. at pp. 1573-1574.)

Moreover, "'[t]he *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citation.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 33, disapproved on another point in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) Nor is it necessary that the *Anderson* "factors be present in some special combination or that they be accorded a particular weight." (*People v. Pride* (1992) 3 Cal.4th 195, 247.) Nevertheless, we agree with respondent that substantial evidence supported all three factors.

The victims were, as far as defendant knew, unarmed and alone in their home very late at night, and defendant had armed himself with a loaded firearm before entering the house to rob them. As such facts support "'the inference that he planned a violent

17

encounter,'" they satisfy the planning factor. (*People v. Elliot, supra*, 37 Cal.4th at p. 471.)

Soriano and Delgado were the only witnesses to defendant's attempted robbery and their struggle could have impeded his escape. Defendant emptied his gun into vital parts of their bodies, ran from the house, and rapidly fled the scene. Under such circumstances, a motive to escape and eliminate witnesses may reasonably be inferred. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [motive to eliminate lone witness and facilitate escape].)

Finally, we reject defendant's characterization of the manner of killing as a spur-of-the-moment impulse because it was not execution style. A decision made quickly does not preclude a finding of premeditation, as "premeditation can occur in a brief period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*Perez, supra*, 2 Cal.4th at p. 1127.) Moreover, shooting Soriano in the heart, lungs, and brain while standing two feet away could reasonably be construed as an execution, as could shooting Delgado a second time in the neck after shooting him in the eye failed to kill him. While more brutal attacks with multiple blows may indicate a rash impulse, they can also reasonably imply a premeditated intent to make certain the victim died. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1293 [throat cut after strangulation]; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1118 [numerous blows to the neck, vital organs, and eye].)

In sum, substantial evidence of planning, motive, and manner of killing supports the reasonable inference that defendant's intent to kill the victims was premeditated, and we reject defendant's contrary inferences. (See *Perez, supra*, 2 Cal.4th at p. 1124.)

## IV. Juror information

Defendant contends that the trial court erred in denying his motion to disclose juror identification information in order to determine whether any judicial misconduct occurred which affected the jury. The motion was brought pursuant to sections 206 and 237 of the Code of Civil Procedure, which permit the trial court to release sealed juror

18

identification information if the defendant establishes a prima facie showing of good cause for the release and there is no compelling interest against such disclosure. (Code Civ. Proc., § 237, subd. (b).)

In support of his petition, defendant submitted the declaration of Brother Carmel Duca (Brother Duca), chaplain for the Los Angeles County Jail, who was sitting in the courtroom, directly opposite the judge, during closing arguments. Brother Duca declared: "When defense counsel was delivering his argument, he mentioned that the victim, Mr. Soriano was probably feeling jealous because [Rosales] had brought the defendant with her. At that point, the Judge started frowning and shaking his head while looking at defense counsel and the jury."

In opposition, the prosecutor represented that defense counsel had told her that Brother Duca was a friend of defendant's family, that she observed him sitting and conversing with defendant's mother throughout the trial, that she did not see the court make any facial gestures, and that it took Brother Duca a week following the verdicts to come forward with his allegation. At the hearing on the motion defense counsel did not deny these representations, but clarified that Brother Duca was not defendant's friend, only his chaplain. The trial court denied having made a face at any point, adding: "I make a specific point of appearing to be neutral at all times. In fact, I remember [defense counsel's] argument and the very point at which this allegation is being made, and I made a very specific point of not looking at the jurors [or] in any way indicating any belief on the court's part as to the validity of any of the argument."

The trial court found that defendant had made an insufficient showing of good cause and denied the motion. Defense counsel then orally moved for a new trial on the same grounds which the court denied.

We review for an abuse of discretion the trial court's ruling that the declarations were insufficient to make a prima facie showing of good cause to unseal juror information. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096.) Defendant's showing must be sufficient to support a reasonable belief that the alleged misconduct occurred. (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552.) Further, the misconduct

19

alleged must be "'of such a character as is likely to have influenced the verdict improperly.' [Citation.]" (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.) A petition to disclose juror identification information must be supported by more than mere speculation and may not be used as a "'fishing expedition[]' by parties hoping to uncover information to invalidate the jury's verdict." (*People v. Rhodes, supra*, at p. 552.)

Defendant suggests that the court's expressions may have been unconscious and thus we should give little weight to the court's disagreement with Brother Duca's account. Referring to Brother Duca's allegations, the trial court stated that "it did not happen." In ruling on a motion to disclose juror information, "'"[t]he power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court"' [citation], even when the witnesses testify via declarations [citation]." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 499.) We thus defer to the trial court's resolution of conflicting recollections and credibility, and do not reweigh the evidence. We find no abuse of discretion.

## V. Consecutive terms for attempted robbery and attempted murder

Defendant contends that the trial court erred in ordering the prison term for the attempted robbery of Delgado (count 5), to run consecutively to the attempted murder, instead of imposing and staying the term pursuant to section 654.

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Section 654 prohibits punishment for two such crimes arising from an indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds by *People v. Correa* (2012) 54 Cal.4th 331, 334, 336.) However, section 654 does not apply to similar but

20

consecutive and different objectives, or to simultaneous but separate objectives. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211-1212.)

"Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance. [Citation.]" (*People v. Beamon* (1973) 8 Cal.3d 625, 636-637.) Thus, whether a course of criminal conduct is divisible presents a factual issue for the trial court, and we will uphold its ruling if supported by substantial evidence. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

A shooting is incidental to a robbery when the defendant's only intent or objective for the shooting is to facilitate the robbery. (See *People v. Hensley* (2014) 59 Cal.4th 788, 828.) However, an act of violence is not incidental to a robbery when it exceeds the force necessary to commit the robbery. (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 272.) An act of gratuitous violence against a helpless and unresisting victim is not considered incidental to robbery for the purposes of section 654. (*People v. Nguyen* (1998) 204 Cal.App.3d 181, 190.) In addition, once a robbery has been committed, an attempted murder committed to effect an escape is not incidental to the robbery for purposes of section 654. (See *In re Jesse F*. (1982) 137 Cal.App.3d 164, 171.)

Here, defendant's robbery attempt was abandoned when the victims resisted, and as we previously found, substantial evidence supported a reasonable inference that defendant's motive in shooting Delgado was to facilitate his escape and to eliminate witnesses. In addition, defendant exceeded the force necessary to commit the robbery or to effect his escape when he shot Delgado in the eye and then again in the neck after

21

Delgado had fallen. Substantial evidence thus supports the trial court's finding that defendant's intent and objective in committing attempted murder were separate and distinct from his intent and objective to rob the victims. The trial court did not err in imposing consecutive sentences.

## VI. Error in abstract of judgment

Defendant points out that although the trial court ordered the sentence as to count 5 to run consecutively, the court imposed and stayed the firearm enhancement of 25 years to life. The abstract of judgment, however, fails to reflect that the enhancement was stayed. Respondent agrees with defendant and both parties ask that we order the trial court to issue a corrected abstract of judgment. Since the writing does not accurately reflect the oral pronouncement of judgment we thus order the trial court to correct the abstract of judgment. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 188.)

**DISPOSITION**

The judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment accurately reflecting the court's oral pronouncement of judgment, in which the firearm enhancement imposed as to count 5 pursuant to section 12022.53, subdivision (d) was stayed. The superior court shall then forward certified copies of the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT